IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 14, 2015 Session

**STATE OF TENNESSEE v. MICHAEL BONSKY**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 12-02445    James M. Lammey, Jr., Judge**

**No. W2014-00675-CCA-R3-CD  -  Filed April 27, 2016**

The Appellant, Michael Bonsky, was convicted by a jury in the Shelby County Criminal Court of second degree murder, attempted second degree murder, and especially aggravated robbery. The trial court imposed a total effective sentence of sixty years in the Tennessee Department of Correction. On appeal, the Appellant raises the following issues: (1) whether the trial court erred by drafting its own jury instruction regarding diminished capacity; (2) whether the trial court erred by admitting evidence regarding the Appellant's presence at a casino and committing a robbery in Mississippi within hours of the instant offenses; (3) whether the trial court erred by admitting a recording of the telephone call one of the victims made to 911; (4) whether the trial court erred by admitting the Appellant's statement into evidence; (5) whether the trial court erred by not allowing an expert witness to testify regarding the Appellant's level of intoxication and his ability to form the requisite intent; (6) whether the trial court erred in sentencing the Appellant; and (7) whether the evidence was sufficient to sustain the Appellant's convictions. Upon review, we conclude that the trial court's instruction to the jury regarding diminished capacity was error and that the error was not harmless; therefore, the Appellant's convictions are reversed, and the case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., joined. JAMES CURWOOD WITT, JR., J., filed a concurring opinion.

Vickie M. Carriker (on appeal and at trial) and David Hamilton (at trial), Memphis, Tennessee, for the Appellant, Michael Bonsky.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity and Bryce Phillips, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

## I. Factual Background

The Appellant's charges stemmed from a March 25, 2012, shooting that resulted in the death of thirty-year-old Roy Townsel, Jr., and the injury of Townsel's girlfriend, Courtney Smith. At trial, the Appellant contended that he was intoxicated and did not intend to kill or injure the victims.

Foad Ahmadi testified at trial that around 6:30 p.m. on Sunday, March 25, 2012, he went to Townsel's residence in the Orange Mound area of Memphis. Townsel lived with Steve McKinney and McKinney's girlfriend, Kristen Smith. When Ahmadi arrived, the Appellant was asleep on a couch. Ahmadi and Townsel left, went to Walmart, and visited friends. As Ahmadi drove Townsel home, Townsel spoke with Courtney[1] over the telephone and arranged to go out to eat later that night. At approximately 9:30 p.m., Ahmadi dropped off Townsel at his home. Thirty minutes to one hour later, a friend called and told Ahmadi that Townsel had been shot. Ahmadi did not believe the report and went to Townsel's residence to check on him. While there, Ahmadi spoke with the police and gave a statement.

Ahmadi testified that he was at Townsel's residence on the Saturday prior to the shooting. The Appellant was there at that time, and Ahmadi did not see him take illegal drugs.

On cross-examination, Ahmadi said that the Appellant, Townsel, and McKinney were friends and were in the music business together. He said that on Saturday, Ahmadi, McKinney, Kristen, Townsel, Courtney, and the Appellant were "hanging out" and watching television at Townsel's residence. Everyone got along and had no problems with each other.

Ahmadi said that when he saw the Appellant on Sunday, the Appellant appeared to be asleep. He did not see any weapons around the Appellant. Townsel did not mention having problems with anyone and appeared to be in a good mood.

Jeremiah King, a 911 dispatcher with the communications department of the Memphis Police Department, testified that 911 received a call at 10:41 p.m. on March 25,

---

[1] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

2012. He identified a compact disk (CD) on which was a copy of the call, and the CD was entered as an exhibit.

Courtney Smith testified that at the time of trial, she was a second-year law student and was living in Little Rock, Arkansas. In March 2012, she lived in Memphis and had been dating Townsel for a few months.

Courtney said that at approximately 9:30 or 10:00 p.m. on the day of the shooting, she drove to Townsel's residence on Carson Street in her 1999 Lexus ES300 sedan, which was worth a few thousand dollars. When she arrived, she parked with the front of her car facing the house. Townsel let her in the front door, which opened into the living room. The Appellant, a white man in his late twenties with "brownish" hair, was lying on the couch in the living room watching television. Courtney and Townsel walked past the Appellant and went into Townsel's bedroom. They sat on the couch inside the bedroom and talked. Townsel sat closest to the door. About fifteen or twenty minutes later, the Appellant kicked open the bedroom door and shot each of them multiple times. Courtney dropped to the floor, and the Appellant shot her in the back as she crawled under the bed. Courtney surreptitiously grabbed Townsel's cellular telephone off the floor and hid it underneath her. At some point, she was able to call 911. The recording of the 911 call was played for the jury.

Courtney said that after the shooting ended, the Appellant rifled through her purse and her belongings, which were strewn on the floor, and then demanded her car keys. Courtney told him that the keys were in the purse. The Appellant took the keys and told her "not to f[****]n' leave." After the Appellant left, Courtney crawled from beneath the bed and ran to a neighbor's house. She was bleeding heavily from the bullet wounds. The neighbor would not let her inside the house but called 911 for her.

Courtney said that she spent two and one-half weeks in the hospital. While she was there, the police brought a photograph array, from which she immediately identified the Appellant. When she saw her car after the shooting, it had some damage and numerous scratches that were not there prior to the shooting.

Courtney said that she was shot in the back, lung, elbow, and wrist. She had nerve damage to her arm, and her elbow had to be reconstructed. At the time of trial, she was using a "breathing apparatus" on a daily basis.

On cross-examination, Courtney said that she had been to Townsel's residence four to six times before the day of the shooting. When she saw Townsel immediately prior to the shooting, he did not appear to be agitated and did not mention that he had been in a fight. When asked whether the Appellant had a reason to hurt her, she responded, "I'm not sure. I mean, he did take my car. I don't know."

Kristen Smith testified that in March 2012, she and her boyfriend, McKinney, had been living on Carson Street for approximately one year, and Townsel had lived with them for about six months. She had known the Appellant for a long time, and they were good friends.

Kristen said that when she awoke on March 25, 2012, the Appellant was asleep on a couch. Around noon, she and McKinney went fishing and to a few other places then returned home. They, Townsel, and the Appellant watched "a little bit" of a basketball game with Antonio and Tori,[2] then she and McKinney left the house around 4:30 p.m.

Kristen said that around 10:00 p.m., McKinney received a call from the Appellant, and they went home. When they arrived, the Appellant was standing beside Courtney's car. Kristen recalled that Courtney usually parked with the front of the car facing the house, but that day it was facing the street. Kristen and McKinney got out of their car, and she heard Courtney talking on a neighbor's porch. Kristen walked to the porch to check on Courtney and discovered that Courtney was bleeding and was on the telephone with 911. She heard Courtney say that Townsel was dead. Kristen ran inside her house and saw Townsel on a couch. He was dead.

Kristen said that when the police arrived, they put her in a police car and that Courtney was taken to a hospital. Kristen said that she gave the police a statement at the scene. Kristen testified that she did not know why the Appellant killed Townsel. After speaking with the police, she went home and discovered that a PlayStation video game system worth approximately $300, five PlayStation video games worth approximately $200, and a laptop computer worth approximately $600 were missing from the house. The items were in the house when she left at 4:30 p.m.

Kristen acknowledged that she told the police she had seen Courtney's car when she arrived home but said that she forgot to tell the police she had also seen the Appellant. She explained that she thought the Appellant was a good friend and that she was in shock after discovering that Townsel was dead. Kristen said that at the time she spoke with the police, she had not noticed that the items were missing from the house.

On cross-examination, Kristen said that on the day before the shooting, the Appellant was at her house with McKinney, Townsel, Antonio, and Tori; they were "doing music" and watching television. Everyone got along and had a good time. They all stayed awake until about 1:00 a.m. When she awoke around 9:30 or 10:00 a.m. the next morning, the Appellant was asleep on a couch. She and McKinney left at noon, and the Appellant was still asleep. She did not see the Appellant awake that day.

---

[2] The record does not reveal the surname of either Antonio or Tori.

Kristen said that she had never seen the Appellant have a problem with anyone, including Townsel. Additionally, she had never seen the Appellant with a gun. She acknowledged that the house was hers and that she might get in trouble if anyone had drugs in the house.

On redirect examination, Kristen said that she had smoked marijuana in the house and that she knew the Appellant had smoked marijuana a couple of times. She never saw the Appellant take "harder" drugs than marijuana but knew that he had taken Ecstasy a couple of times when he was out of town. She said that Courtney's car was not at the house when Kristen returned from the police station.

Steve McKinney testified that he had known Townsel for at least seventeen years and considered him to be a good friend. McKinney had known the Appellant for at least fourteen years and was also a friend of his.

McKinney said that on the day of the shooting, he, Kristen, and Townsel watched a basketball game on television. Around 4:00 p.m., McKinney and Kristen left and went to a friend's house. Sometime around 10:00 p.m., the Appellant called and said that three white men came into the house and tried to rob him and Townsel. The Appellant said that he had been shot in the shoulder. McKinney said that the Appellant sounded "panicky."

McKinney said that he and Kristen immediately drove home, arriving within five to seven minutes. As they pulled into the driveway, he noticed the front door was open, but the screen door was closed. Normally, they did not leave the front door open. Kristen got out of the car; McKinney stayed to do "something to the car because . . . it was running hot." Kristen came back to the car and told him Townsel had been shot and was dead. McKinney and Kristen went into the house and saw Townsel lying unresponsive on a couch in his bedroom. McKinney's friend Tori was upstairs in the soundproofed music studio. Kristen and McKinney went outside and saw that the police had arrived. McKinney said that he never saw Courtney because he went straight into his house.

McKinney said that later, he and Kristen went to the police station to give statements. When they returned home, he discovered that a PlayStation video game system, PlayStation video games, and a laptop computer were missing. He estimated that the value of the missing items was over $2,000.

McKinney acknowledged that he had smoked marijuana in the past and that seven or eight years earlier, he was convicted of selling marijuana. After his conviction, he stopped selling drugs and made money by installing flooring. He explained that making music was something he did "on the side."

McKinney said that he knew the Appellant had smoked marijuana and taken Xanax in the past. The Appellant never told him that he used "hard drugs." McKinney noted that the Appellant had been in and out of town a lot prior to the shooting and that he did not know if the Appellant used drugs while he was out of town. He noted, however, that Kristen found something in a spoon in a bathroom of their house on one occasion and that when asked about it, the Appellant "said he wasn't doing anything."

On cross-examination, McKinney said that the name of his music business was 240 East Entertainment, that he was a producer, and that the Appellant worked as the "computer guy." The Appellant had stayed with McKinney on prior occasions and came to the house a couple of days prior to the shooting. The day before the shooting, the Appellant, McKinney, Kristen, Townsel, Tori, and "a couple of other people" watched a basketball game at McKinney's house. McKinney recalled that everyone got along. He said that the Appellant did not fight with anyone, that he did not use drugs, and that he did not have a gun. McKinney acknowledged, however, that he did not watch the Appellant the entire night.

McKinney said that he went to bed around 11:30 p.m. or midnight and that he got up at 11:00 or 11:30 a.m. The Appellant was still asleep and slept the majority of the day. McKinney said that when the Appellant called to say that he and Townsel had been shot, the Appellant did not sound like himself and was not calm.

McKinney acknowledged that the Appellant did not have "a problem" with Xanax. The Appellant took Xanax to "[g]et so high, he'd just want to be sitting there passing out." McKinney said that the spoon Kristen found in the bathroom was empty when he saw it. Kristen told McKinney that she also found a tissue with a small amount of blood on it. McKinney thought that the Appellant might have been "shooting up" and asserted that neither he, Kristen, nor Townsel used intravenous drugs. McKinney acknowledged that he had been convicted of selling drugs and that he would have gotten in trouble for having drugs in the house. McKinney said that he did not own a weapon, noting that he was a convicted felon and could not legally own a handgun.

On redirect examination, McKinney said that he had never seen the Appellant with a gun. McKinney had no idea why the Appellant would shoot Townsel. McKinney said that the Appellant had never behaved violently after smoking marijuana.

Memphis Police Officer Norman Bruce White testified that on March 25, 2012, he responded to a report of a shooting on Carson Street. He arrived around the same time as his partner, Officer Lisa Lester. The officers saw a couple, a male and a female, in the driveway of the house next door, and the couple said that their friend had been shot. The officers entered the house where the shooting occurred and looked around to confirm that

the shooter was gone. In the back bedroom of the house, the officers found a black male who had been shot and was unresponsive. When the officers spoke to the couple again, they learned that the Appellant was the shooter and that he had driven off around the same time the police arrived. The officers learned that a female also had been shot.

The parties then entered the following stipulation:

> "That on April 2nd, 2012, a Memphis Police Officer Barbarotto processed an Apple cell phone, Cricket phone, a cigarette lighter, remote control, and a Sprint cell phone for latent prints.
>
> Further, that on April 6th, 2012, Memphis Police Officer Carlisle processed a 1999 Lexus for latent prints. These prints were examined by latent print examiner Larry Preston who compared these prints to the inked finger impressions for [the Appellant]. Examiner Preston found that the latent prints did not match the prints belonging to [the Appellant]."

Officer Eric Hutchison, a crime scene investigator with the Memphis Police Department, testified that he and Officer L.D. Walker processed the crime scene. The residence was a red brick, single family dwelling. The front door was "a side load type" that opened into the living room. In the living room were three couches, a coffee table, and a television.

Officer Hutchison said that in Townsel's bedroom, he found a purse lying on the bed. He also found five shell casings that had been fired by a 9 millimeter Luger semi-automatic handgun. The bullets were larger than a .22 or .25 caliber. Officer Hutchison explained that a 9 millimeter bullet was a "[f]airly large caliber, . . . just below" a .40 caliber bullet in size. Officer Hutchison had known of suspects picking up shell casings in an attempt to "cover their tracks."

On cross-examination, Officer Hutchison acknowledged that all of the shell casings he found were in plain sight.

Officer Hutchison said that he found a large amount of blood under the bed and a possible blood smear along the west wall and window frame. The blood transfer puddles, smears, and drips he found along the bedroom floor were consistent with someone crawling from underneath the bed.

In the driveway, Officer Hutchison found keys and a cellular telephone. More blood was found on the front porch of a neighbor's house; the house was on the same side of the street as the victim's house, and the houses were separated by only a driveway.

Crime Scene Investigator Eric Carlisle testified that on April 6, 2012, he and Sergeant Eric Freeman went to Ashland City, Mississippi, to process a gold Lexus ES300 that was in the custody of the Benton County Sheriff's Department. Investigator Carlisle said that there were scratches and dents on the car and that the license plate had been removed. Investigator Carlisle found some fingerprints in the car, but none matched the Appellant. A single leather work glove was found in the trunk. Investigator Carlisle said that wearing gloves would prevent someone from leaving fingerprints.

On cross-examination, Investigator Carlisle said that no DNA test was performed on the glove and that he did not know who had worn the glove.

Memphis Police Sergeant Anthony Mullins testified that on the night of the shooting, he and Sergeant Freeman spoke with witnesses who identified the shooter as "Memphis Mike," which was the Appellant's nickname. On March 27, 2012, the Appellant was apprehended in Albany, Mississippi. The Appellant was the sole suspect in the shooting.

Dr. Marco Ross, the Shelby County Medical Examiner, testified as an expert in forensic pathology. Dr. Ross performed an autopsy on Townsel's body. He determined that Townsel had been shot five times and that the cause of death was multiple gunshot wounds. The right middle finger and "ring finger" had been struck by a bullet. Dr. Ross opined that the wounds to Townsel's fingers were possibly defensive wounds. A toxicology test was performed, which revealed a "fairly low level" of Oxycodone in the victim's blood. Dr. Ross said that the level was consistent with a therapeutic dose.

On cross-examination, Dr. Ross said that Oxycodone levels typically diminish over time, that he did not know when the victim took the drug, and that he did not know whether the victim had a prescription for the drug.

The Appellant testified that when he was twelve years old, he began stealing Xanax from his mother. By the time he was fifteen years old, he was addicted to drugs. He said that his mother had physically and sexually abused him and that they had a "rocky relationship." The Appellant said that when he was fifteen or sixteen years old, he experimented with Ecstasy and prescription cough syrup.

The Appellant said that in 2006, he was with Chrissy Davis, a good friend whom he called his "sister." They were attempting to buy marijuana, and some people

- 8 -

attempted to rob them and shot into the Appellant's car. During the altercation, Davis was shot in the back but was not killed. The Appellant said that he started having nightmares, paranoia, and "bad anxiety" and that he never recuperated from the event. The Appellant sought treatment from Dr. Thomas Bannister, whom he saw two or three times. Dr. Bannister diagnosed him with post-traumatic stress disorder (PTSD), manic anxiety, and depression. The Appellant was prescribed Xanax, Celexa, and Seroquel. The Appellant's grandmother, who paid for him to see Dr. Bannister, also paid to have the prescriptions filled. The Appellant began abusing the medication, and his grandmother refused to take him back to the doctor.

The Appellant acknowledged that in 2006, he was convicted of misdemeanor theft in Tennessee and that in 2010, he was convicted of larceny in Mississippi.

The Appellant said that he had been a friend of McKinney for over ten years. Eventually, the Appellant started "doing music" with McKinney, through whom he met Townsel. All three men became good friends.

The Appellant said that at the time of the shooting, he had been staying at McKinney's house for approximately two weeks. On Friday, March 23, 2012, two days before the shooting, the Appellant's father sent the Appellant a "moneygram." The Appellant paid a few debts with the money and bought 20 "bars" of Xanax, marijuana, Oxycodone, and heroin. After obtaining the drugs, he "hung out" at McKinney's studio, listened to music, and took the drugs he had bought. The Appellant maintained that he and the friends with whom he was staying "all kind of dealt with drugs."

The Appellant said that he knew he used drugs on Saturday but could not remember the amount. He could not recall the time he awoke on Sunday. He went to the studio and smoked marijuana with McKinney, Kristen, and Townsel. Thereafter, McKinney and Kristen left the residence, and the Appellant lay down on the couch. The Appellant's next recollection was Townsel's waking him, saying that the Appellant's friend Jamie was there. After Jamie came in, the Appellant got up, and they smoked marijuana. The Appellant and Townsel ate pizza after Jamie left, then Townsel left.

The Appellant said that his friends knew he was taking Xanax and smoking marijuana but that they thought he was selling the Oxycodone and heroin. Thereafter, on Sunday, he waited until his friends were out of the house before he took the Oxycodone and the heroin, which he used intravenously. The Appellant said that the drugs "made [him] feel normal" and "zone[d him] out."

The Appellant knew that Townsel had said Courtney was coming over for a date but could not recall if he saw her come into the house. The Appellant said that when he "came to," he had a "weird feeling" that someone who intended to rob them was outside

the house. He felt paranoid and looked out the window. He saw "suspicious things" and got a gun from McKinney's bedroom. The Appellant said that McKinney had obtained the gun for protection after he was robbed in 2010. After getting the gun, the Appellant went back to sleep on the couch. He said, "It felt like a dream." His last thought before falling asleep was that "someone was going to try to rob us."

The Appellant said that when he "came to," he "had shot [Townsel], and Courtney was screaming, and she was underneath the bed." The Appellant maintained that he had not met Courtney before the shooting and that he had no problems with Townsel. He asserted that he had not associated his feelings of paranoia with Courtney or Townsel. He did not recall picking up any shell casings after the shooting, taking the PlayStation, or saying anything to Courtney. He did, however, recall grabbing Courtney's car keys from the floor and driving away in her car. He maintained that he did not remember calling McKinney at 10:44 p.m. on the night of the shooting and that he "[v]aguely" remembered seeing McKinney and Kristen outside before he drove from the scene.

The Appellant said that he had no continuous memory of the events of that night and that he remembered only "bits and pieces." When he drove away from the house, he knew that he had shot his friend Townsel but was not aware that Courtney had been shot. He said that his memories of the weekend started to "blur" after he started taking drugs on Friday, noting, "I was coming in and out." The Appellant explained that he had experienced a couple of blackout episodes each week for a number of years and that he had reported the blackouts to doctors. He also stated that his friends knew about his blackouts. He said that his friends did not know that he was "shooting up" but that they almost caught him when they found a spoon in the bathroom the week before the shooting.

The Appellant acknowledged that he spoke with officers from the Memphis Police Department while he was in DeSoto County and gave a lengthy, detailed statement. He remembered meeting with the police and said that he was not having a blackout at the time. However, he could not recall much of what he said because he was "under detox medication" and hallucinating when he gave the statement. In the statement, the Appellant said that on the night of the shooting, he saw four large black men outside McKinney's house and that each man was over thirty years old. The Appellant then said that one of the men must have been over thirty-five. One of the men was rolling a marijuana "blunt." The Appellant told Townsel that "[t]hose dudes are out there," but Townsel told him that he was high and should lie down. Instead, the Appellant went outside to stand on the porch. One of the "dudes" then "knock[ed the Appellant] off in a car" and asked, "'Can I buy a bar,'" meaning he wanted to purchase Xanax from the Appellant. The Appellant responded that he had Xanax. The Appellant told police that the men had a little revolver and a "big silver weapon." One of the men put a gun to the back of the Appellant's head, led him in the house, and tried to push him into the

- 10 -

bathroom. Another man ran upstairs to the studio. Yet another man went into McKinney's bedroom and came out with a pistol; the Appellant said that the man was unarmed before he went into the room. The Appellant told the police that he did not know where McKinney kept the gun or he would have gotten it to protect himself; he said, however, that he had a .22 caliber pistol in his waistband.

In the statement, the Appellant also said that Townsel was shot while trying to get up from the couch. Courtney was in Townsel's lap, and Townsel tried to push her out of the room. The Appellant said that he did not know Courtney was shot and that he thought she ran away. The Appellant recalled five or six shots being fired. After the gunmen shot Townsel, the Appellant chased them and shot at them. The Appellant also said that one of the gunmen got the keys to Courtney's car. When the Appellant went outside to chase the men, the car was empty and was running; the Appellant got in the car and left. The Appellant stated that he searched the car the next morning and discovered a bag of change, an Acer mini laptop computer, and a gun. He threw the gun "in the water."

The Appellant testified that he was no longer hallucinating when he spoke with Dr. Smith. The Appellant told Dr. Smith that he saw three black males and that after he saw the men, he got a gun and lay down.

The Appellant said that after the shooting, he went to the Horseshoe Casino in Tunica, Mississippi, "to try to blend in with the crowd and get away from – I didn't know what else to do." He explained that he wanted to hide because he was afraid he would be killed. He did not remember getting a player's rewards card while at the casino. He remembered having some mixed drinks but could not recall anything that happened after he "started drinking heavily."

The Appellant testified that before he was apprehended, he was

> down in Benton County, Mississippi, [and] I started smoking some methamphetamine. I'd ran out of pills and drugs, and I started hallucinating as the police were surrounding the house, and I took the gun and threw it in the field behind the house in the woods, not far from where I parked the car.

On redirect examination, the Appellant acknowledged that he shot Townsel and Courtney and that he had no reason to do so. He said that he gave his statement to the police while he was in jail in DeSoto County. He said that he talked to Dr. Smith a "few months after coming here" and that he was not under the influence of any intoxicants when he spoke to the doctor.

On recross-examination, the Appellant acknowledged that he signed an advice of rights form before speaking with the police on March 28, 2012. He said, "I was coming off of the drugs, and I was hallucinating. I don't really remember much about all that."

Bridget Lea Burford, a licensed practical nurse who worked at the DeSoto County Jail, testified that the prisoners were given any medication they needed at three different times a day: 8:00 a.m., 2:00 p.m., and 8:00 p.m. At the time the Appellant was incarcerated at the jail, the staff relied on prisoners to disclose any drug problems they had. The Appellant disclosed that he had taken heroin and Xanax. Burford explained that the Appellant was put on an "opiate protocol" to treat any symptoms associated with his withdrawal from heroin; the protocol consisted of ibuprofen for aches and pains and Phenergan for nausea and vomiting. The Appellant was also put on a "klonopin taper" because "you can't stop benzodiazepines [like Xanax] abruptly." Burford stated that Phenergan and klonopin cause sedation and dizziness. The Appellant was given the medication for the first time on the morning of March 29, 2012.

On cross-examination, Burford said that the protocols the Appellant was on would not cause a person to be "incoherent or out of [his] mind."

On redirect examination, Burford stated that she did not personally treat the Appellant or observe the effects of the medication.

Dr. Murray Smith, an expert in addiction medicine, testified that he evaluated the Appellant in September 2013 and that he prepared a report about the evaluation on September 16, 2013. The evaluation consisted of a face-to-face meeting with the Appellant and an examination of his medical and jail records. The records revealed that the Appellant had been treated for anxiety, depression, panic attacks, and PTSD. Additionally, the Appellant had hepatitis C, which typically resulted from intravenous drug use. The Appellant also "met the criteria for poly substance drug addiction."

Dr. Smith said the Appellant reported that his mother and maternal grandfather were alcoholics, which led Dr. Smith to believe the Appellant had a genetic predisposition to addiction.

Dr. Smith stated that generally PTSD was caused by a traumatic event, which he described as an event that threatened severe damage to a person's body or death. He explained that PTSD could cause a person to have trouble sleeping, which in turn could lead to the person's self-medicating by taking calming drugs such as alcohol, marijuana, or Xanax. The Appellant disclosed two events that led to his PTSD. First, he was physically abused by his stepfather and his mother when he was twelve years old. Second, in June 2006, he saw his best friend, a female, get shot.

- 12 -

The Appellant told Dr. Smith that on March 25, 2012, he "was doing what he normally did at that time," namely drinking alcohol, taking Xanax, smoking marijuana, and injecting narcotics intravenously. The Appellant reported that when he was twelve years old, he began having episodes of amnesia related to the use of alcohol and Xanax. On the afternoon of March 25, the Appellant was experiencing amnesia. Dr. Smith said that amnesia could occur two ways. First, the person could remember one thing then nothing else until "wak[ing] up," like turning "an on/off switch." Second, the person could remember certain things, "like little snippets from a movie."

The Appellant told Dr. Smith that during his amnesia on the afternoon of March 25, he remembered seeing people on the street outside that he thought were coming into the house to rob and shoot people. When the Appellant told Townsel, Townsel reassured him that nothing suspicious was happening. The Appellant said that he knew a gun was hidden in the house and that he got the gun for protection. Dr. Smith opined, "[T]hat reaction would fit with both the use of alcohol and drugs impairing his perception and judgment; and also, the PTSD, having witnessed the shooting of his friend, that this might well happen to him, and he was feeling that in his own self, that he was in grave danger."

Dr. Smith said that when in a state of amnesia, a person's "perceptions of what's real are altered. Your judgment of what's right/wrong, good/bad, what's the best discernment of what to do is impaired so that the amnesia is also a symptom of other things happening in the brain . . . ." Dr. Smith further explained:

> And what we know is, that at that stage of intoxication or poisoning – toxic means poison – so intoxicated means you're in the state of brain poisoning, you resort down to what's called the survival brain – the brain that enables you to figure out how to make sure you don't get hurt – how to get out of situations – how do you perform functions that keep you alive and going. So, it's more like living in a reflex type situation where you're operating even though you're operating with not the higher part of your reasoning intact but just the survival part.

The Appellant told Dr. Smith that he "found himself . . . with a gun in his hand and having shot his good friend." At the point when the Appellant "found himself," he was "out of his blackout" but may have still been impaired depending on the drugs he had taken. Dr. Smith theorized that the Appellant's "survival brain" caused him to grab the keys to Courtney's car and leave, explaining that "survival means you either fight or you flee."

Dr. Smith said:

> It is my opinion that [the Appellant] was poisoned, that his brain was not functioning in a way that he could perceive the reality of what was happening or make realistic decisions about what he should do. He could not discern what was necessary to conform his actions to those that a non-intoxicated person would be able to discern.

Dr. Smith further opined that the Appellant could not form the intent to commit first degree murder because "he was not in realistic time or place. His perceptions, his judgment were not there in the way that a non-poisonous brain would do." Dr. Smith said that the Appellant was acting reflexively and that

> his decisions were entirely primitive brain-type decisions and not thoughtful concerned judgmental decisions. They were reflex survival decisions. And his survival, he felt delusionally; and delusion means that you have a firmly-held belief that actually was not in fact. His delusion belief is that he was going to be attacked, and he was reacting, in some way, to that delusion; but he was not in realistic time.

Dr. Smith attributed the Appellant's reactions to his "overlying fear from the PTSD that his life was being threatened, and then he had the impaired or poisoned brain from the Xanax, alcohol, mari[j]uana, and narcotics."

On cross-examination, Dr. Smith agreed that his diagnoses were based upon the Diagnostic and Statistic Manual (DSM) and that there had been several versions of the DSM, the most current of which was the DSM-V. Dr. Smith conceded that in the various versions of the DSM, "some things have been considered mental disorders at one time, and some of them have been considered not disorders at another time."

Dr. Smith said that PTSD can cause "hyper-vigilance" and sleep disturbances but that it did not necessarily cause violent behavior. Dr. Smith said that the Appellant's "horrendous" reaction to telling the doctor about his friend being shot "gave [the doctor] the impression" that the friend had died. Dr. Smith acknowledged that lots of people experience traumatic events without developing PTSD.

Dr. Smith said that the Appellant said that he took a lot of different drugs but that Dr. Smith had no way of verifying the drug usage. The doctor noted that many addicts were secretive about the type and amount of drugs they take. Dr. Smith said that it was not unusual for his patients to report episodes of amnesia. He acknowledged, however,

that there was no way to verify that a patient had a blackout and that the Appellant's medical records did not reflect a history of blackouts.

Dr. Smith acknowledged that the Appellant gave a lengthy, detailed statement to the police on March 28, 2012, and that many of the details differed from what the Appellant told the doctor and what the Appellant told McKinney on the telephone. Dr. Smith said that the Appellant was "still under the influence" and that he was "receiving Ativan, which is in the same family as a Xanax," at the time he gave his statement to police. When asked if the Appellant would have motivation to "not have memories of certain things," Dr. Smith responded, "[H]e was still in survival brain."

Dr. Smith acknowledged that he usually testified on behalf of the defense. He said that he spent two hours talking with the Appellant and seven hours reviewing the Appellant's records. Dr. Smith opined that the Appellant was candid with him. Dr. Smith knew that the Appellant went to the casino after the shooting and said it did not change his opinion regarding the Appellant's ability to premeditate. He explained, "The level of what he took and when he took it was going down, so his brain was becoming less poisoned as time went on."

On redirect examination, Dr. Smith said that he had reviewed the statements of the witnesses, such as McKinney, Kristen, and Courtney. He opined that the statements supported his conclusion that the Appellant was under the influence that day. Specifically, he said that the statements reflected that the Appellant was alone on the couch, not paying much attention to anyone, "which, to me, meant that his brain alertness was decreased from the use of the drugs."

When asked about the statement the Appellant gave to police, Dr. Smith said:

> I think two things were influencing him at the time. First is he was still coming down from the brain poisoning from the intoxication, and he also had medication in his system that was administered by the jail to detox him from the Xanax, and the medication to detox him would have a similar effect on the brain but just a lesser amount gradually as the Xanax that was one of the principal causes for his brain poisoning or intoxication.

Dr. Smith said that addicts generally did not seek medical help because "they're prescribing their own medicine." He stated that the Appellant's blackouts were induced by drug and alcohol use.

On recross-examination, Dr. Smith again said that the witnesses' statements indicated that prior to the shooting, the Appellant "was isolated on the couch and not spending time to relate to them socially." He acknowledged, however, that the Appellant could have been asleep instead. After the doctor testified, the defense concluded its proof.

James Phillip Mixon, the surveillance manager at the Horseshoe Casino in Robinsonville, Mississippi, testified as the State's first rebuttal witness. He said that on March 26, 2012, the casino received a "be on the lookout" notice (BOLO) from Tunica County law enforcement "for a suspect that was wanted in a possible armed robbery." The BOLO contained a description of the Appellant, including the tattoo on his right wrist. Security staff recognized that the Appellant had been playing at the craps table earlier that morning. The staff reviewed the security video and saw the Appellant playing at the craps table around 2:00 a.m.

At that point, the security video from the casino was played for the jury. The video revealed that the Appellant came into the casino at approximately 1:00 a.m., immediately walked to a bar, and ordered a mixed drink. Mixon noted that the casino's bartenders had been instructed not to serve alcohol to anyone who was obviously intoxicated. On the video, after the Appellant obtained his drink, he walked to the Total Rewards counter and applied for and received a player's card to earn points by playing the games. Thereafter, the Appellant played some slot machines, using the player's card each time. He then played at the craps table, which Mixon described as "the most difficult game that we have on the casino floor." The Appellant "actively particpat[ed]" in the game and made several successful bets. The Appellant left the casino at 2:21 a.m.

On cross-examination, Mixon acknowledged that people got intoxicated at the casino but again asserted that staff members were supposed to refuse to serve alcohol to any intoxicated person. Mixon agreed that the video did not necessarily depict the Appellant's having long conversations or interactions with other people.

William Henry Mullen, Jr., an investigator with the Tunica County Sheriff's Department,[3] testified that on March 26, 2012, he received a report of a robbery at a convenience store. Mullen went to the scene and looked at the store's security footage. The footage revealed that the Appellant arrived in the parking lot in a light-colored Lexus. At approximately 3:30 a.m., the Appellant robbed the store clerk. Mullen obtained a photograph of the Appellant from the security footage and distributed it to the news media and the local casinos. Shortly thereafter, an employee from Horseshoe Casino reported that the Appellant had been seen on the premises.

---

[3] At the time of trial, Mullen was no longer with the sheriff's department.

- 16 -

Eddie Baker testified that he was working at the convenience store on March 26, 2012. Sometime between 2:00 and 4:00 a.m., the Appellant came into the store. He bought two cigarillos, which were on sale. At the time of the purchase, other customers were in the store. After making the purchase, the Appellant left the store. Once the other customers left, the Appellant returned. He told Baker that he wanted two more cigarillos because he had gotten such a "good deal" on the first two. Baker turned to get the items. When he turned back to face the Appellant, he saw that the Appellant was pointing a handgun at him "[s]ideways." Baker opined that the gun looked like a "nickel-plated forty."

Baker said that the Appellant took approximately $300 from the store. Baker said he was so nervous that he initially gave the Appellant only part of the money. The Appellant demanded all of the money, saying, "Man, just give me the money. Don't make me – don't make me bust you." Baker responded, "Man, you don't have to do that, man. The money [is] insured. You don't have to do that." After the Appellant got the money, he told Baker to walk over to the ice cream machine and face the wall. Baker complied, and the Appellant left the store.

Baker said that one or two days after the robbery, the police showed him a photograph array, from which he identified the Appellant. Baker identified the Appellant in court as the perpetrator. He said that he was "ninety-nine percent sure" of his in-court identification, noting that the Appellant had gained weight and was wearing glasses.

Memphis Police Sergeant Michael A. Brown testified that after the Appellant was apprehended in Mississippi, he and Sergeant Carson went to the DeSoto County Jail on March 28, 2012, and at around 11:55 a.m., took a statement from the Appellant. Prior to the statement, the officers advised the Appellant of his rights. Sergeant Brown saw nothing to indicate the Appellant was under the influence of drugs or alcohol. Sergeant Brown said that the Appellant seemed to comprehend the questions and that his answers were understandable.

On cross-examination, Sergeant Brown said that he was unaware that the Appellant began medication for an "opiate protocol" at 8:00 a.m. on the morning of the statement.

On redirect examination, Sergeant Brown said that he saw nothing unusual about the Appellant. He stated that the Appellant was talkative and seemed ready for the officers to take his statement. The Appellant was coherent, asked questions, and was able to explain his answers.

Based upon the foregoing, the jury found the Appellant guilty of the lesser-included offenses of second degree murder and attempted second degree murder, as well

as the charged offense of especially aggravated robbery. The trial court sentenced the Appellant to twenty-five years, ten years, and twenty-five years, respectively. The court ordered the sentences to be served consecutively for a total effective sentence of sixty years.

On appeal, the Appellant raises the following issues: (1) whether the trial court erred by drafting its own jury instruction regarding diminished capacity; (2) whether the trial court erred by allowing evidence regarding the Appellant's presence at a casino and committing a robbery in Mississippi within hours of the instant shooting; (3) whether the court erred by allowing the State to play the call Courtney made to 911; (4) whether the trial court erred by admitting the Appellant's statement into evidence; (5) whether the trial court erred by denying the testimony of Dr. Zager regarding the Appellant's level of intoxication and ability to form the requisite intent; (6) whether the trial court erred in sentencing the Appellant; and (7) whether the evidence was sufficient to sustain the Appellant's convictions. We will address the Appellant's issues in a different order than that in which they were raised.

## II. Analysis

### A. 911 Tape

#### 1. Admissibility

The Appellant contends that the trial court erred by admitting the audiotape of Courtney's call to 911. He argues that the recording was not relevant and, if relevant, its probative value was outweighed by the danger of unfair prejudice. The State asserts that the trial court correctly admitted the tape. We agree with the State.

Prior to trial, defense counsel filed a motion in limine, seeking exclusion of the audiotape recording of Courtney's call to 911. At a hearing on the motion, which was held immediately before trial began, defense counsel argued that the tape was not relevant or material and was unfairly prejudicial. The State responded that nothing about the tape was unfairly prejudicial. The trial court asked when the call took place. The State answered that Courtney called 911 at 10:41 p.m. and that the Appellant called McKinney at 10:45 p.m. to report that he and Townsel had been shot by white men who broke into the residence. The court found that the call occurred on or about the time of the event and that the timing of the call was highly relevant. Defense counsel asked the court to listen to the tape, explaining that during the call Courtney described her wounds, asked for help, and said that she did not know where she was. Defense counsel contended that Courtney could testify as to what transpired during the 911 call. Defense counsel noted that Kristen also could be heard on the recording "just screaming and crying . . . very emotional[, saying,] 'My friend is dead – my friend is dead.'" Defense

counsel again asserted that if the recording were relevant, it was unfairly prejudicial. The trial court responded, "I've never seen a 911 tape that was unfairly prejudicial since I've been doing this." Nevertheless, the trial court stated that it would adjourn court for the day and address the issue the next day.

The following morning, the trial court listened to the recording, which lasted approximately ten minutes. At the beginning of the recording, Courtney told the 911 operator that she had been shot, that she could not breathe, and that she needed help. The operator asked for her address, and Courtney responded that she did not know the address. The operator said that she could not send help if Courtney did not tell her where to send it. After some rustling sounds, Courtney said she was on Carson Avenue but did not know the number of the house. The 911 operator again said that she needed an address in order to send help. Soon thereafter, Courtney knocked on the neighbor's door. She told the neighbor that she had been shot in the house next door and needed the neighbor to tell the 911 operator the address.[4] Courtney relayed the address the neighbor gave her, and the operator promised to dispatch an ambulance. Courtney then told the operator that someone had stolen her car and shot her. The operator asked Courtney who shot her. Courtney responded, "I don't know, some white guy." Courtney begged for help, saying, "I'm bleeding so much." The operator again asked who shot Courtney, and Courtney replied, "I don't know. . . . I don't know this man at all who shot me." She said that she was at a friend's house when she was shot. At that point, Kristen's voice could be heard in the background, talking to Courtney. The operator asked to speak with the other person. When Courtney remained on the line, the operator asked for more details about the shooting. Courtney said, "I was in the house and this white guy came and shot us." Kristen asked, "In our house?" Courtney responded, "Yes." The operator asked, "Who was that in the background," and Courtney handed the telephone to Kristen. The operator asked Kristen what had happened. Kristen said, "I just got to my house." She said that she saw Courtney on the front porch and that Courtney had been shot. Kristen began crying and stated, "She said Roy's dead." Kristen told the operator that she did not know exactly what happened but repeatedly declared that "[h]e's dead. . . . My friend's dead." Kristen began speaking in a high-pitched, distressed voice and asked for an ambulance to be sent. The call ended at that point.

After listening to the recording, the court stated, "I don't hear anything particularly unduly prejudicial about that. They do say that it was a white guy, so it's relevant for I.D." The court further noted that the call transpired on or about the time of the event, that the statements were excited utterances, and that the call was relevant to the timing of events. The court asserted that it did not hear anything particularly troubling on the recording. The court found that the probative value of the recording was not substantially

---

[4] At that point, the neighbor made a separate call to 911 while Courtney continued to talk to the 911 operator. The neighbor's call was not played for the jury.

outweighed by any unfair prejudice.

Defense counsel then requested that the court redact Kristen's statement "My friend is dead." Defense counsel argued that Kristen's statement did nothing to identify a perpetrator or place anyone at the scene. Defense counsel contended that her statements were unduly prejudicial. The court disagreed and ruled that the entire recording could be played for the jury. On appeal, the Appellant argues that the recording was not relevant and was unduly prejudicial.

Generally, "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The trial court found that the recording of the 911 call was relevant to establish timing and a description of the shooter. We agree and conclude that the Appellant is not entitled to relief on this issue.

## 2. Mistrial

The Appellant next contends that the trial court erred by failing to grant a mistrial after the victims' families were disruptive during trial. The State maintains that the trial court properly refused to grant a mistrial.

The record reflects that after the recording of the 911 call was played for the jury, the trial court stated for the record, "[State,] if you would please inform the family – people on that side of the courtroom, I will not tolerate any further outbursts. . . . and if they do it again, they're not coming back in the building. If you would inform them of that, I would appreciate it." The State complied.

Defense counsel asked for a jury-out hearing, which the trial court granted. The State apologized, saying, "I didn't anticipate that. I mean, I didn't think it would cause that kind of a . . . ." The court interjected, "It didn't help you any." The State agreed. Defense counsel began to speak, but the trial court interrupted:

It's not grounds for a mistrial. It didn't help the state at all. In fact, it hurt their case tremendously. If that's what the family wants to do is hurt the state's case, that's fine. That's up to them. They are not coming back in the courtroom if they are going to cause disturbances like that; but it is not prejudicial against [the Appellant]. I will assure you that it hurt the state tremendously; and so I'm not even entertaining any type of mistrial. It wasn't that bad. It was just the family got upset and stormed out and basically made fools of themselves. So, if that's what they want to do, they can stay out of the courtroom.

Defense counsel responded:

Judge, I understand you overruled it before I could make it; but for the purposes of the record, I would[] like to say[] we were going to move for a mistrial due to the outburst. It would go, once again, to the prejudicial factor of the tape – or at least that end part of the tape. . . . The family became upset and disrupted the proceedings.

The court denied the motion but acknowledged that it might have to grant a mistrial if the family continued to be disruptive. When the jury returned to the courtroom, the trial court stated:

All right. Ladies and gentlemen, before we took a recess, there was some disturbance in the back of the courtroom. I will have to admonish you – remind you that you are to base your decision in this case on the evidence that comes through the witness stand, the law that I give you to that evidence without any sympathy or prejudice for or against either side. Okay. So, is that understood?

. . . .

So, please disregard everything that happened before. I don't anticipate it will happen again.

On appeal, the Appellant maintains that "[w]hile the tape was played, family members began to cry and become extremely disruptive. . . . While it is not reflected in the written record, the trial was halted because family members were screaming and some

were bodily escorted from the courtroom." He challenges the trial court's denial of his motion for mistrial after the disruption. The State responds that a mistrial was not warranted. We agree with the State.

A mistrial is a procedural device that is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). In other words, there must be a "manifest necessity" for a mistrial to be declared. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The party seeking the mistrial has the burden of establishing the necessity of granting the mistrial. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008). In conducting our review of this issue, we note that this court has previously found that "[t]he decision of whether to grant a mistrial is within the sound discretion of the trial court. This court will not disturb that decision absent a finding of abuse of discretion." State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (citation omitted).

In the instant case, the trial court determined that the appropriate remedy for the victim's family's outburst was to give a curative instruction, not to grant a mistrial. We conclude that the trial court did not abuse its discretion. The Appellant is not entitled to relief.

## B. Expert Testimony

The Appellant argues that the trial court erred when it refused to allow Dr. Lynn Zager to testify for the defense regarding the Appellant's capacity to form the necessary mens rea for first degree murder, which is referred to as diminished capacity. The State responds that the trial court correctly ruled that Dr. Zager's testimony did not meet the necessary requirements for testifying about the Appellant's capacity to form a mental state.

During a jury-out voir-dire examination, Dr. Lynne Zager testified that Dr. John Worley, Debbie Nichols, and she evaluated the Appellant. Dr. Zager reviewed the information provided by the State, including "the probable cause, an affidavit of complaint, and then the homicide defendant's statement." She was not, however, provided statements from any of the witnesses. She also spoke with the Appellant.

Dr. Zager said that she and Dr. Worley agreed that

> "[a]lthough details of the shooting are not clear, there is nothing to suggest that the [Appellant] would have been impaired in his ability to appreciate wrongfulness by any mental illness, and his ability to form intent or to choose not

to commit such crimes would have been unimpaired in the absence of intoxication."

After the doctors reviewed the Appellant's jail records, they learned that the Appellant had been given medication for PTSD. The Appellant had no symptoms of psychosis and exhibited nothing to support an insanity defense. The Appellant told Dr. Zager that he was abusing opiates intravenously and that he was intoxicated at the time of the shooting. He recalled "coming to" after the shooting and hearing a woman scream. The Appellant said that he did not "recall what happened from a certain time when he had concerns about people who were outside. He was concerned about their safety. He went to sleep, and the next thing he recall[ed] is that a woman was screaming and a shooting had occurred."

Dr. Zager diagnosed the Appellant with PTSD, polysubstance abuse and dependence, and anxiety. She found that "[w]ith regard to diminished capacity at the time of the alleged offense of murder first degree, the [Appellant's] ability to form the culpable mental state was impacted by a self-imported [(sic)] substance[] intoxication."

On cross-examination, Dr. Zager acknowledged that neither her report nor Dr. Worley's report stated that the Appellant "lacked the ability to form a specific intent." Dr. Zager said that the Appellant's

> ability to form the culpable mental state was impacted by self-reported substance intoxication. And I think it's important that it be noted that it's self-reported; that I don't have independent information to support that he was intoxicated. In some cases there might be that; in this case, what I have is his report.

Dr. Zager said that she did not agree with Dr. Smith's finding that the Appellant "did not have the ability to form a specific intent for premeditation."

The trial court asked Dr. Zager if the difference in her opinion and Dr. Smith's opinion was "semantics." She responded:

> Having not talk[ed] to him about it – Dr. Smith, I don't know. I don't know it's important to me as a mental health professional. I am not a lawyer. I don't know legal things except what I've learned through the years through the lawyers I've worked with. And I think it's important that issues like this, that my job is to do a mental health evaluation and determine, from my expertise, if and what is wrong with

a person and then be available to explain that to the court. In terms of what the conclusion is, that's up to the trier of fact.

Dr. Zager said that at the time of the shooting, the Appellant was suffering from the "Axis I mental defect" of "substance dependence . . . [a]nd anxiety issues." She explained that the substance dependence diagnosis was based solely upon the Appellant's self-reported behavior but that the diagnosis of anxiety was "not just self-report[ed]. It's based on a traumatic incident that he experienced; and there are some records that support that versus just what he tells me."

The court asked Dr. Zager if her opinion was affected by the Appellant's behavior, namely committing another robbery after the shooting. She replied:

> It certainly does. The problem that I have is when somebody is in a blacked-out state, they really – they might have bits and pieces. That's the most honest person who is telling me about being in a blacked-out state. They have bits and pieces, but they don't recall exactly what happened.
>
> Now, when that blacked-out state stops and the person is cognizant of what they're doing again, it may well be that the blackout stopped and hours later, he was aware of what he was doing, casing a place and robbing a place. So, it's very difficult for me to say, without having been there – or without having somebody who was there who was doing good observation that they can share with me. It's very hard for me to speak exactly about what occurred.

At that point, defense counsel conducted redirect examination of the doctor. She said that knowing the Appellant gambled and committed a robbery after the shooting would not change her opinion. She noted that she did not know when the Appellant's blackout stopped but that he said it was over when he heard screaming. She explained that when the blackout ended, the Appellant was able to think and plan. She stated:

> I don't think it's clear for me, when it comes time for diminished capacity – for or insanity, it says I can't offer an opinion – I cannot tell you yes or no, although I'm often forced to do that. But, as I understand what the law says, I'm not supposed to give an opinion about that; I'm just supposed to provide information. So it would be helpful for me to have more information so I can do a better job for the court.

Dr. Zager acknowledged that in a blackout, a person could do something they would not do under normal circumstances because the "filters" that ordinarily stop them are not working.

At the conclusion of Dr. Zager's testimony, the State asserted that her testimony should not be allowed unless she was willing to testify that the Appellant lacked the ability to form the requisite intent for the charged offense. The trial court observed that Dr. Zager "didn't go as far as Dr. Smith did in the two-prong analysis that's required under the law. So, because of that, I mean, what she has to say is very interesting; but I don't think she met the standard under the two-prong test." The court summarized, "She didn't say the magic words. . . . And the state gave her an opportunity to do that and she said she really couldn't answer it."

Generally, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). In this regard, Tennessee Rule of Evidence 401 broadly provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Even relevant evidence may be excluded, however, if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Moreover, Tennessee Rule of Evidence 702 requires that expert testimony "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," and Rule 703 requires that the facts or data underlying the expert's opinion be trustworthy. A trial court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In Hall, our supreme court explained "diminished capacity" as follows:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation

of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). However, the Hall court cautioned that "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." Id. at 690. Our supreme court emphasized that "'[i]t is the showing of [a] lack of *capacity* to form the requisite culpable mental intent [due to a mental disease or defect] that is central to evaluating the admissibility of expert psychiatric testimony on the issue.'" State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005) (quoting Hall, 958 S.W.2d at 690).

In State v. Ferrell, 277 S.W.3d 372, 379 (Tenn. 2009), our supreme court clarified that the "decision in Hall established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense. . . ." Id. at 379. Our supreme court explained that the Hall holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" Id. (quoting Hall, 958 S.W.2d at 691). The court further explained that "Hall recognized that a defendant may negate an element of the offense as a defense to the prosecution." Id. at 380. The Hall court explained that

> to gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

958 S.W.2d at 689.

We agree with the State that Dr. Zager's testimony was inadmissible under Hall because she did not testify that the Appellant lacked the mental capacity to commit the crimes. See Faulkner, 154 S.W.3d at 56-57; State v. Frederick Thomas, No. W2013-02763-CCA-R3-CD, 2015 WL 2258151, at *5 (Tenn. Crim. App. at Jackson, May 6, 2015), perm. to appeal denied, (Tenn. Aug. 13, 2015). In Hall, our supreme court specifically stated that the admissibility of an expert's testimony regarding a defendant's

- 26 -

diminished capacity requires a showing (1) that the defendant "lacked the capacity" to form the culpable mental state and (2) that he lacked the capacity due to a mental disease or defect. In the instant case, Dr. Zager testified about the Appellant's PTSD, anxiety, and intoxication. However, when the State specifically asked if she could say that the Appellant lacked the capacity to premeditate or act intentionally, she answered negatively, saying that she could only state that his ability to form a mental state was "impacted." The fact that the Appellant's mental disease may have impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in Hall. Therefore, we conclude that the trial court did not abuse its discretion by ruling that Dr. Zager's testimony was inadmissible.

## C. Rebuttal Evidence

The Appellant argues that the trial court erred by allowing the State to admit proof regarding the Appellant's presence at a casino, his robbery of a convenience store, and his statement to the police as rebuttal evidence. The Appellant contends that the State did not present evidence that he felt animosity toward the victims or needed money. He further contends that evidence regarding his presence at the casino and the subsequent convenience store robbery was irrelevant to the case and that he did not open the door to allow the acts to be admitted. The State responds that the trial court did not err by admitting any of the proof.

"Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" Id. (citing State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App. at Nashville, Nov. 15, 1995)). The admission of rebuttal evidence is within the sound discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of that discretion. See State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002).

### 1. Casino

First, we will address whether the trial court abused its discretion by admitting proof that the Appellant went to a casino following the shooting. Initially, we note that the Appellant made scant argument in his brief regarding the admissibility of proof regarding the Appellant's presence at the casino, gave only the most general citations to authority, and listed almost no citations to the record. Tennessee Rule of Appellate Procedure 27(a)(7) provides that an appellant's brief must contain an argument that sets forth:

(A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

The Appellant has met this burden in only the most superficial way on the issue of the admissibility of evidence regarding the Appellant's presence at the casino. Nevertheless, we will address this issue.

The record reflects that at the conclusion of the defense proof, the State announced its intention to present as rebuttal, evidence regarding the Appellant's visit to a casino in Tunica. Defense counsel responded:

> We've reviewed the tapes and the reports that were given to us today right before lunch, I believe. One of those is basically surveillance video from Tunica. And this is rebuttal evidence. He knew, on cross examination, that he was in Tunica and he might have been sitting in a slot, he was doing (indiscernible) then. So, there's no – there's no challenge. I mean, he admitted to that. So, for this as rebuttal proof, it seems like this is inappropriate. It's to rebut something that we have put on in our case-in-chief, and he has already admitted to that.

The State argued that its

> position is that in order for us to rebut this lack of premeditation, we're attempting to show that [the Appellant] went down to the Horseshoe Casino. He has denied that he got or had the Player's Card, which our proof will show is not true.
>
> Also, he's down there playing some very complex games which require a lot more mental thought than somebody who does not have that type of . . . . He's playing

craps, which is one of the most complicated games that you can play down there.

Defense counsel noted that the video did not show that the Appellant interacted much with people.  Counsel observed that the Appellant admitted on cross-examination that he went to the casino, got a drink, and played games.  She then asked, "So, what is there to rebut?"  The State explained that "this goes to his – the whole situation where he is claiming that he can't remember most things.  And this is two hours after the killing."

The court said that the Appellant "testified that he was basically in a sedated state; that when he got there it started wearing off.  But he had a few drinks, and, therefore, he was in a sedated state again."  The court observed, "I've tried to play craps too, and I lose all my money every time I do it.  So, it is quite a complex game.  You really have to know what you're doing."  The State noted that the Appellant won some of his bets at the craps table.

On appeal, the Appellant argues that the trial court erred in holding that the Appellant's testimony regarding his mental state "opened the door to any and all subsequent behavior."  The Appellant alleges that the court's "misapplication of the law and murky understanding of diminished capacity opened the door to everything [the Appellant] did from hours to days after the shooting."  The State responds that the Appellant's proof suggested that the shooting "resulted from his drug addiction, post-traumatic stress disorder, and psychotic delusions."  The State explained that the rebuttal proof demonstrated that "just hours later he was casually strolling through a casino, playing complex games, and committing another armed robbery," and argued that the State was entitled to challenge the Appellant's claim.  We agree with the State.

The defense's proof at trial was that the Appellant began taking marijuana, Oxycodone, heroin, and Xanax on Friday and continued to use the drugs periodically over the course of the weekend.  The Appellant contended that on Sunday, he was so intoxicated, or as Dr. Smith testified, "brain poisoned," that he shot Townsel and Courtney.  The Appellant contended that immediately after the shooting, he "came to," grabbed Courtney's car keys, and left the residence.  He did not recall taking any additional items from the residence.  Dr. Smith said that once the Appellant "found himself," he was out of the blackout state but could have still been impaired.  The Appellant acknowledged that he went to a casino after the shooting.  He said that his intoxication was beginning to wear off but that once he had a few mixed drinks, he became intoxicated again.  Dr. Smith said that at the casino, the Appellant's brain was "becoming less poisoned."

The trial court observed that the Appellant was

the one that said he was comatose for days – and hallucinating, so come on. . . . Let's just assume, for argument sake, that you have a video, and he's stumbling around there falling dead drunk, stammering, hitting the walls, bouncing off the walls, people are helping him up, you would put that in. No doubt – no doubt. So, I mean, we have the opposite situation. We have someone that's lucid – that's able to play craps – that's winning at craps – staking out a place to rob . . . .

Okay. So, I don't know. I think it's a stretch to say that it's not relevant. It's clearly relevant. I think the probative value completely outweighs any unfair prejudice because he's the one that says he was comatose. He's the one that says his mental capacity was such that he couldn't formulate any premeditation or any intent or any knowledge or anything like that. He was just totally surprised at all this. So, I don't know. I think it's clearly relevant.

As the trial court observed, the Appellant's proof was that he was coming in and out of a "sedated" state for as many as three days after the shooting. Therefore, the Appellant's behavior a few short hours after the shooting was relevant. The State's rebuttal proof demonstrated that during that time, the Appellant acted normally in the casino and did not demonstrate any remorse, going so far as to obtain a player's card to earn rewards while gambling shortly after killing his friend. Additionally, the Appellant actively and skillfully played craps, a game that required thought and strategy, which demonstrated that the Appellant's ability to think and plan was not as impaired as the Appellant and Dr. Smith alleged. Given the foregoing, we conclude that the trial court did not err by allowing the State to introduce proof of the Appellant's activities at the casino as rebuttal evidence.

2. Convenience Store Robbery

The Appellant contends the trial court erred under Tennessee Rule of Evidence 404(b) by allowing evidence of the convenience store robbery. The Appellant maintains that the defense proof of diminished capacity did not "open the door" to evidence of other acts and that it was offered as propensity. He maintained that his testimony at trial was that at the time of the shooting, he was incapable of forming the mens rea for first degree murder and that immediately after the shooting, he awoke from his "blacked out state." The State asserts that the trial court did not err.

At trial, the State informed the trial court that it intended to introduce video and witnesses to prove that the Appellant robbed a convenience store. The court stated, "That definitely goes to culpable mental state – guilty knowledge . . . ." Defense counsel objected, arguing that the Appellant was charged with especially aggravated robbery in the instant case and that introducing proof of another robbery was "very dangerous territory . . . it's to show conformity." The State responded, "No, it's not." The trial court found, "It's to show intent – that he had the ability to form – formulate the mental capacity to commit a murder." The State asserted

> that it goes towards motive. His motive was – part of it was to get proceeds from the original robbery selling off some of the goods in the interim hour; he's down in Tunica two hours later gambling with some type of money. And then he used the stolen car to get down there and to get the robbery and escape the robbery with hundreds more dollars.

Defense counsel asked if the State had proof that the Appellant pawned the items taken from the scene of the shooting, and the State acknowledged that it did not. The court observed that the State could "make an inference that he did certain things."

The court observed that in relation to Rule 404(b), with a video and witness testimony, "it's pretty clear that it happened." The court said:

> Now, what is the relevance of it? – that's all 404(b) is, is a rule of relevance.
>
> Most of the time, if it shows propensity to commit a crime, but here we have within hours. You know, these are the hours that [the Appellant] is claiming that he is just completely whacked out. He's in a comatose state –
>
> . . . .
>
> . . . He's all this stuff, and so [defense counsel] is saying that it's not relevant to show that his mental capacity and his ability to reason and his ability to do certain things during this whole time – I mean, this is just a matter of hours.

The court asked how much time elapsed between the shooting and the convenience store robbery, and the State responded that it was approximately four hours. The State alleged that the convenience store surveillance video showed that that the Appellant planned the robbery, noting that

[h]e goes in the store twice. He goes in and cases it when the customers are there. He leaves. He goes in to buy something – under the pretense of buying something. He goes right back out. When all the customers leave, he comes back in and robs the place. I mean, that's planning.

Defense counsel argued, "The testimony was that he was in a blackout state and he came to at the time of the murder." The court said:

So, I mean, is the jury going to believe that? – so everything that has something to do with whether they believe that or not is relevant. So, that's what 404(b) is, is relevant – whether it's relevant.

. . . .

And to say that his ability to do this four hours later when he claims to have been in a comatose state and sedated such that he couldn't remember where he was, what he did – anything? I think the jury ought to be allowed to hear that.

Defense counsel further argued that the proof demonstrated

that everything was not a complete and total blackout; that this was in and out. Dr. Smith has testified that brain toxin and what happened to his brain, that goes up and down. And we feel that when we put him on during direct, that did not open the door. He came to, and while he can't remember everything, he does remember some things. So, our argument is, first of all, that that door was not opened; that it's unfairly prejudicial and that it's inappropriate under 404(b).

The court stated:

Well, I think it is definitely appropriate[] under 404(b). I mean, if it had been ten days later – ten days before, but we're talking about a matter of hours when [the Appellant] is claiming that he's in and out – in and out. Well, who is to decide that's true? – me? I might have said, "Well, yeah, I believe him," so, therefore I'm not going to let the evidence in. I can't – I can't do that. It is for the jury to decide

whether or not they want to believe it. So, regardless, if they want to believe every word Dr. Smith had to say, well, that's their prerogative. If they don't want to believe any of it, that's their prerogative. And you're saying that based on what he said, he was coming in and out, therefore, you shouldn't let this 404(b) evidence in. That's – that's – I think I've made my point. It is certainly relevant.

Tennessee Rule of Evidence 404 provides:

(b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). "Rule 404(b) would permit the

introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate cases. In determining whether to allow the admission of evidence of subsequent crimes, wrongs, or acts in a given case, trial courts should be mindful of the similarity of the offenses or acts and the proximity in time." State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003).

In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the Appellant's character. In the instant case, the trial court determined that the proof about the convenience store robbery was "highly relevant" to show the Appellant's ability to form a mental state. The court also determined, given the video of the robbery, that the proof of the crime was clear and convincing. The court found that the probative value of the crime was not outweighed by the danger of unfair prejudice. We acknowledge that proof of another robbery within four hours of the robbery that accompanied the shooting was potentially highly prejudicial. See State v. Calvin Person, No. W2011-02682-CCA-R3-CD, 2013 WL 5883796, at *14 (Tenn. Crim. App. at Jackson, Oct. 31, 2013). "On the other hand, similarity may make the probative value quite high as well." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (LEXIS publishing, 6th ed. 2011). The convenience store robbery was committed in the timeframe during which the Appellant alleged he was intoxicated and not thinking clearly, making the probative value great. See State v. Richard Dickerson, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003, at *10 (Tenn. Crim. App. at Jackson, Mar. 19, 2014), perm. to appeal denied, (Tenn. Sept. 3, 2014). Moreover, we note that the trial court gave a detailed instruction to the jury regarding how the evidence should be considered.

From the foregoing, we conclude that the trial court did not abuse its discretion by allowing the evidence of the convenience store robbery to be admitted as rebuttal proof.

### 3. Appellant's Statement

The Appellant contends that the trial court erred when it allowed his statement into evidence. However, he did not support this contention with argument, authority, or citations to the record. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).

### D. Jury Instruction

The Appellant argues that the trial court erred by creating its own jury instruction regarding how to consider proof of the Appellant's mental state. The State responds that the jury instruction "properly set forth the law regarding the use of expert testimony to prove [the Appellant's] mental state." In the alternative, the State maintains that any

error regarding the instruction was harmless.

Near the end of the defense's proof, the trial court asked the parties to review the proposed jury instructions. The court said:

> You know, I'm looking at this mental charge that's in this pattern jury instruction; and it doesn't go along at all with the law on diminished capacity. It doesn't go along with it at all. I mean, it seems, at the very least, that the two-prong test, there ought to be something in there about what responsibility – because on insanity, that's an affirmative defense, and the defense has to prove that he was insane. And it's pretty much the same way with diminished capacity. I don't know what the – because it's the same jury charge. . . .
>
> . . . .
>
> . . . I know there's several cases, one, they raised a mental defense, but they also wanted a separate diminished capacity; and they said, "Well, the mental – insanity covers it." But there was another one where they said, "Well, basically diminished capacity is saying that he couldn't form intent," so there's no need to even have a jury instruction on diminished capacity because the intent instruction – if he's so whacked out he couldn't intend anything, then, of course, they couldn't prove intent. So, it would be not really necessary to have an instruction.
>
> . . . .
>
> The problem with the instruction now is it doesn't say what is the responsibility and what is the burden of proof on behalf of the defendant when it comes to this. I don't know if it's clear and convincing evidence they have to show it by or if it's just by a preponderance of the evidence. And, of course, there's no instruction on that. It doesn't say that you have to prove it beyond a reasonable doubt. It doesn't say you don't have to either. You know what I mean? And so I'm just concerned with giving an instruction that's improper because it uses the word "might" – "might have" – and, of course, I think you have to show that it did affect – the two-prong test to make it admissible.

- 35 -

To make it admissible, it doesn't say that it might have. As a matter of fact, I think . . . we're lessening the responsibility of the defense – what they have to do. They have to meet these two criteria in order to – so, I think it should be in the jury charge that he did suffer – you have to find that he suffered from a mental defect or mental disease; and you have to find that he lacked the capacity to form the requisite mens rea.

And then, also, from the [Hall] case, it's pretty clear that – basically what the [Hall] case is saying is that, "Well, you know," – diminished capacity is basically saying that the defendant is accepting responsibility, but he's saying that he's not culpable for the charged offense; but he may, in fact, be culpable for a lesser-included offense. There's nothing in the charge about that. And that's basically what the whole purpose of diminished capacity is – where somebody accepts responsibility – "yeah, I did it," but I was so whacked out, you know, I didn't – I couldn't form the intent. . . . But there's nothing in there that says, you know, anything about that. It just doesn't look good.

. . . .

I just think the jury charge has to at least meet that instead of saying, "Might have."

He did not have the requisite – not "Might have," because that lowers the burden of the defense. Then, again, what is the – it's not beyond a reasonable doubt – is it by a preponderance of the evidence that you have to prove that, or is it by clear and convincing evidence? I think it's grossly unfair to say that it might have when the rule say's [(sic)] – doesn't use the word, "Might."

Defense counsel responded, "I think it gets a little scarey [(sic)] to think of constructing our own actual instruction considering that this . . . has been considered sufficient."

The next day of trial, the trial court noted that it had "put together" an instruction that "more accurately reflects the actual law as it pertains to what is commonly called

diminished capacity." The court acknowledged that the words "diminished capacity" should not be used in the charge.

The court said:

> But the charge – what I did was I took the law – the two elements that have to be shown to the jury, to the jury's satisfaction; that the defendant had a mental disease or defect at the time of the commission of the offenses charged; that because of the mental disease or defect, the [Appellant], at the time of the commission of the offenses charged, lacked the capacity to form the requisite culpable mental state. And I said that that had to be proved by clear and convincing evidence.
>
> Now, the pattern jury instruction doesn't say that; however, when you look at the insanity charge, it says that that has to be shown by clear and convincing evidence. And the way that this charge was formulated, it appeared to me to – even though these two things had to be proven – it said, "Well, if you find that he might have had a" – "might have" – then, you know, you have to find him not guilty. And I don't think that's the law, and I don't know how that got in the pattern jury instructions. It doesn't seem right to me. So, I'm changing it. And right or wrong, I believe that – they – they can't go back there an[d] think, "Well, maybe the defense had to prove this beyond a reasonable doubt." That would be something I would think – hey, if they put on an expert to say that, maybe they had to prove that beyond a reasonable doubt. And say, "Well, no, they didn't prove it beyond a reasonable doubt that he had a mental disease or whatever," but they may find, by clear and convincing evidence – you see what I mean? So that's the reason why I think there has to be something that tells them, you know, what standard of proof there is for the defense on this. Certainly it can't be beyond a reasonable doubt. That wouldn't be right. But I think clear and convincing evidence would be a proper thing to tell them.
>
> So, I basically tweaked the pattern instruction and added those two criteria from . . . [Hall], but the – it seems like there was . . . another case that spelled out those two particular things.

Defense counsel objected, expressing a preference for the "mental state instruction." The State contended that the trial court's proposed charge "reflects the law more clearly."

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts should give an "instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App. 1994). Our supreme court has cautioned that "a trial court's jury charge should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (internal quotation marks and citations omitted). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

At the time of trial,[5] the Tennessee Pattern Jury Instruction regarding diminished

---

[5] The current pattern instruction omits the "might have" and "may have" language that concerned the trial court and reads as follows:

> The state must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the state must prove is contained in the elements of the offense(s) as outlined in these instructions *[above] [below]*.
>
> In this case, evidence has been offered that the defendant suffered from a mental *[disease] [defect]* that prevented *[him] [her]* from forming the culpable mental state required to commit a particular offense. The testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of mental disease or defect, not just a particular emotional state or mental condition. However, it is for the jury to determine whether or not the defendant suffered from a mental disease or defect and whether, as a result of the mental disease or defect, the defendant was unable to form the culpable mental state.
>
> If you find from the evidence that the defendant was unable to form a particular culpable mental state, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time

capacity provided, in pertinent part, as follows:

> "The state must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the state must prove is contained in the elements of the offense(s) as outlined in these instructions *[above] [below]*.
>
> In this case, you have heard evidence that the defendant might have suffered from a mental *[disease] [defect]* which could have affected *[his][her]* capacity to form the culpable mental state required to commit a particular offense. . . .
>
> If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense *[he][she]* is guilty."

Hatcher, 310 S.W.3d at 806-07 (quoting T.P.I.—Crim. 42.22 (2009)).

Instead of utilizing the foregoing instruction, the trial court instructed the jury as follows:

**EVIDENCE OF MENTAL STATE**

> The State must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind

---

of the commission of the offense to determine of which, if any, offense *[he] [she]* is guilty.

T.P.I.—Crim. 42.22 Evidence of mental state (footnotes omitted).

- 39 -

which the state must prove is contained in the elements of the offenses as outlined in the instructions above.

In this case, you have heard evidence that the defendant may have suffered from a mental disease or defect, which affected his capacity to form the culpable mental state required to commit the offenses charged. The testimony must demonstrate by clear and convincing evidence:

1. That the defendant had a mental disease or defect at the time of the commission of the offenses charged; and

2. That because of the mental disease or defect, the defendant, at the time of the commission of the offenses charged, lacked the capacity to form the requisite culpable mental state.

"Clear and convincing evidence" means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

The testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of mental disease or defect, not just a particular emotional state or mental condition. However, it is for the jury to determine whether or not the defendant suffered from a mental disease or defect.

If you find by clear and convincing evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense he is guilty.

In determining the defendant's mental status at the time of the alleged crime, the jury is entitled to look to all the evidence of his actions and words before, at, and immediately after the commission of the alleged crime.

Additionally, we note that when the trial court instructed the jury regarding the charged and lesser-included offenses, the court asserted that the State must prove all of

the essential elements, including mens rea, beyond a reasonable doubt. Further, the court instructed that "[t]he state has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the state throughout the trial of the case. The defendant is not required to prove his innocence."

As the trial court instructed, the State, not a defendant, is responsible for proving mens rea, which is an essential element of the crime(s) charged. Tenn. Code Ann. § 39-11-201(a)(2). "A defendant is not required to present any proof at all." State v. Clark, 452 S.W.3d 268, 290 (Tenn. 2014).

This court has previously held that if the jury is properly instructed regarding the mens rea for the charged and lesser-included offenses, no further instruction on diminished capacity is absolutely necessary. See State v. Grose, 982 S.W.2d 349, 354 (Tenn. Crim. App. 1997); see also State v. Garland Godsey, No. E2000-01944-CCA-R3-CD, 2001 WL 1543474, at *3 (Tenn. Crim. App. at Knoxville, Dec. 4, 2001); State v. Larry Dean Dickerson, No. W2000-02201-CCA-R3-CD, 2001 WL 1042128, at *4 (Tenn. Crim. App. at Jackson, Sept. 10, 2001). While pondering the correct instruction to give regarding the Appellant's mental state, the trial court compared diminished capacity to insanity. However, diminished capacity and insanity cannot be equated. "[I]nsanity is an affirmative defense, and as such, the defendant bears the burden of proving the defense by clear and convincing evidence." State v. Kennedy, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004). Diminished capacity is not an affirmative defense; instead, it is "a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." State v. Phipps, 883 S.W.2d 138, 148 (Tenn. 1994); see State v. Adams, 405 S.W.3d 641, 660 (Tenn. 2013) (stating that "diminished capacity is not a defense to a criminal charge, but evidence of diminished capacity is admissible to negate mens rea"). In other words, "diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense." State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997).

The instant instruction required the Appellant to negate his mental state, an essential element of the offense, by clear and convincing evidence. The instruction shifted the burden of proof regarding an essential element of the offense to the Appellant; therefore, the instruction was erroneous and unconstitutional. See McDonald v. Tenn., 486 F. Supp. 550, 553 (M.D. Tenn. 1980) ("There can no longer be a shifting of the burden of proof to the defendant as to any essential element of a criminal offense."). This court has held that an erroneous jury instruction concerning "'an element of the offense which might lessen the burden of proof placed upon the [S]tate is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt.'" State v. Finch, 465 S.W.3d 584, 605 (Tenn. Crim. App. 2013) (quoting State v. Guy, 165 S.W.3d

651, 659 (Tenn. Crim. App. 2004)); see also State v. Page, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002).  The Appellant's mental state was a highly contested issue at trial. The instruction essentially shifted the burden of proving a mental state to the Appellant, effectively lessening the State's burden of proof.  Accordingly, we cannot say that the error was harmless beyond a reasonable doubt.  As such, we must conclude that the Appellant's convictions must be reversed.

### E.  Sufficiency of the Evidence

Even though we have found it necessary to reverse the Appellant's convictions, we must address the sufficiency of the evidence to determine whether he should be subject to a new trial or the convictions should be reversed and the charges dismissed. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

To sustain the Appellant's conviction for second degree murder, the State was required to prove that the Appellant knowingly killed the victim.  See Tenn. Code Ann. § 39-13-210(a)(1).  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."  Tenn. Code Ann. § 39-11-302(b); see also State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000).  A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Serious bodily injury is defined as a bodily injury that involves:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is eight (8) years of age or less

Tenn. Code Ann. § 39-11-106(a)(34).

The proof adduced at trial revealed that the Appellant was staying with McKinney,

- 43 -

Kristen, and Townsel. The Appellant spent the day of the shooting on the couch, apparently asleep. McKinney and Kristen left the residence, but Townsel and the Appellant stayed. When Townsel's girlfriend, Courtney, arrived at the residence that night, she and Townsel went into Townsel's bedroom to talk. Approximately fifteen minutes later, the Appellant kicked in the bedroom door. Without saying anything, the Appellant began shooting at them. Each victim was struck multiple times, and Townsel was killed. The Appellant shot Courtney in the back as she crawled under the bed. The Appellant took Courtney's car keys then walked through the house, taking a PlayStation video game system, video games, and a laptop computer. The Appellant called McKinney and said that three white males had broken into the house and shot him and Townsel. By the time the police arrived, the Appellant had left in Courtney's car. The Appellant drove to a casino in Tunica, Mississippi. Over the next couple of hours, the Appellant obtained a player's reward card, drank several mixed drinks, and played slot machines and a complicated table game. At the time of trial, Courtney still used a ventilator on a daily basis.

The Appellant concedes that he shot the victims; however, he maintains that he could not have formed the mental state of knowingly at the time of the shooting. In support of this contention, he asserts that the "majority of witness testimony" was that the Appellant was "in a sedated state" for most of the day and that he was not involved in a dispute with Townsel or Courtney. The Appellant also asserts that he and Dr. Smith testified that at the time of the crime, the Appellant was suffering from a mental defect and intoxication that caused him to black out; therefore, the Appellant "was unable to act with premeditation or in a knowing manner, and therefore was only guilty of a reckless homicide."

"Our jurisprudence recognizes that the mental state, a necessary factor of almost all our criminal statutes, is most often proven by circumstantial evidence, from which the trier of fact makes inferences from the attendant circumstances and from which that body weighs the circumstantial evidence." State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. at Nashville, Oct. 13, 2000). The jury could infer that the Appellant acted knowingly by firing multiple shots at the victims from relatively close range. See State v. Walfrido L. Rodriguez, No. M2005-01351-CCA-R3-CD, 2006 WL 1626845, at *4 (Tenn. Crim. App. at Nashville, June 7, 2006). Moreover, it was within the province of the jury to determine the credibility of the witnesses and to decide whether to accredit the Appellant's claim that he could not formulate the necessary mens rea for the crime. See State v. Adams, 405 S.W.3d 641, 661 (Tenn. 2013); State v. Robert Leonard Mosley, No. W2004-00228-CCA-R3-CD, 2005 WL 905772, at *10 (Tenn. Crim. App. at Jackson, Apr. 19, 2005); State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813, at *13 (Tenn. Crim. App. at Jackson, Nov. 20, 2002). We conclude that the evidence was sufficient to sustain the Appellant's convictions.

F. Sentencing

Finally, the Appellant contends that the trial court erred when it imposed the maximum sentence and ordered the sentences served consecutively. The State responds that the trial court correctly sentenced the Appellant. Even though we have concluded that the Appellant is entitled to a new trial, we will briefly address his sentencing issues in the event of further appellate review.

At the sentencing hearing, the State argued enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, was applicable to all of the convictions. The State acknowledged enhancement factor (6), that the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from the victim was particularly great, was not applicable to the Appellant's especially aggravated robbery conviction because it was an element of the offense but contended that it was nevertheless applicable to the remaining convictions. The State argued that the trial court should apply enhancement factor (8), that the Appellant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community. The State noted that the Appellant was on probation or parole in Mississippi at the time of the instant offenses and that his probationary sentence was revoked on April 15, 2012. The State acknowledged enhancement factor (9), that the Appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, could not be applied to his especially aggravated robbery conviction because it was an element of the offense but asserted that it was applicable to the remaining convictions. The State further argued enhancement factor (13), that the Appellant was on probation or parole at the time of the instant offenses, was applicable to all convictions.

The State contended that the Appellant should receive consecutive sentencing because he was a dangerous offender whose behavior indicated that he had little or no regard for human life and no hesitation about committing a crime when the risk to human life was high and because the Appellant was being sentenced for an offense committed while on probation. Tenn. Code Ann. § 40-35-115(b)(1), (6). The State argued:

> Although [the Appellant] does not have a lengthy history, his behavior in the case is that he is very definitely a danger to the community because he is not hesitant about committing a crime that involves death or serious bodily injury. He has killed one person about 10:40, seriously wounds another victim. He takes the property from the house. He goes down to Mississippi and gambles as if, you know, he doesn't have a care in the world. Then he commits

- 45 -

a convenience store robbery where he places a weapon on a store clerk and takes money from there.

Defense counsel said that the Appellant would not testify at the hearing but that the Appellant would rely upon his testimony at trial concerning his mental issues. Defense counsel contended that the Appellant did not have a sustained intent to violate the law and that he had expressed remorse for the crimes. Defense counsel conceded that the Appellant had "some violations of probation and parole." Defense counsel argued that "the finding of [the Appellant] as a dangerous offender must be solely based on circumstances surrounding the crime which he is being sentenced for" and not for his subsequent behavior in Mississippi.

The trial court rejected the Appellant's claim that he was suffering from PTSD and anxiety and from the effects of drugs at the time of the offenses, noting that approximately one hour after the offenses, the Appellant was acting normally while strolling around a casino. The court discredited defense counsel's assertion that the Appellant did not have a sustained intent to violate the law, observing that the video of the convenience store robbery "indicates to me that he had a sustained intent to violate the law. . . . Talk about someone that's cold – cold – that was just incredible." Moreover, the court found that the Appellant's lying immediately after the crime about white guys committing the shooting then going to gamble made defense counsel's claim that the Appellant was remorseful seem disingenuous. The court said that the Appellant said he was remorseful but that the Appellant's actions demonstrated otherwise. The court said that the Appellant's committing the instant offenses while on probation for grand larceny proved that he was "not subject to being rehabilitated."

The court stated that enhancement factor (1) applied to each of the offenses because the Appellant had a history of criminal convictions and that he had a history of criminal behavior, namely his drug usage. Tenn. Code Ann. § 40-35-114(1). The court found that the Appellant treated Courtney with exceptional cruelty during the commission of the offense and applied enhancement factor (5) to the attempted second degree murder conviction. Id. at (5). The court said, "He's shooting at her the whole time she's crawling under the bed trying to escape. Then he has the audacity to come back in and demand to know where the keys are to her car. If that's not heartless, I don't know what is. That's – but it's definitely – that's cruel – in my opinion, that applies to the criminal-attempt murder." The court also found that enhancement factor (6), that the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great, applied to attempted second degree murder. Id. at (6). The court found enhancement factors (8) and (13) applied to each of the convictions because the Appellant was on probation at the time of the instant offenses. Id. at (8) and (13). The court found enhancement factor (9), that the Appellant possessed or employed a firearm during the commission of the offense, was applicable to the second

degree murder and attempted second degree murder convictions.  Id. at (9).

The trial court said:

> So, as far as the charge of murder second degree, he is facing fifteen to twenty-five years at one hundred percent.  I think he was guilty of murder first degree which would have carried fifty-one years.  I saw the proof.  I think, by a preponderance of the evidence, he was guilty of maybe not beyond a reasonable doubt, but by a preponderance of the evidence.  So, should I give him the minimum on murder second degree if I think he really was guilty of murder one?  That's illogical in my opinion, plus all these aggravating circumstances that apply – his prior drug usage, his being on probation, his grand larceny, his prior criminal behavior, and the subsequent robbery at the store – twenty-five years at one hundred percent.
>
> As to the criminal-attempt murder second degree, that is a B felony, eight to twelve years.  I think ten years is appropriate.  There were three aggravating circumstances that apply to that and no mitigation.  I'm sorry.  I made a mistake that should be twelve years at a hundred percent.
>
> And the especially-aggravated robbery, another A felony – fifteen to twenty-five years with no mitigation, with several enhancement factors that apply, that is also twenty-five years.
>
> To say that he is not a dangerous offender is a joke.  It really is.  Just looking at the facts of this case – just by itself – discounting his other stuff going on, he's a dangerous offender.  I don't know how anyone could look at it and say it's not.  The circumstances surrounded the commission of this offense are particularly aggravated.  He tried to lie to get out of trouble.  He took the victim's car and went to Tunica to gamble.  Talk about heartless.
>
> He basically tortured one of the victims by shooting at her while she's trying to crawl under the bed to escape and kills the other victim.

It's extremely violent. To say it's not – to run these concurrent would be an insult to the victims in this case. Basically it would be saying, "Well, you can kill someone and attempt to kill someone – or rob them – but we're going to give you three for the price of one," or whatever. It just is nonsense. Looking at the facts of this case, it is extremely aggravated, and I think the aggregate length of the sentences – consecutive sentences – reasonably relates to the offense for which the defendant stands convicted.

So, you add twenty-five and twenty-five, that's fifty, plus twelve is sixty-two years.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113

and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court erred by imposing the maximum sentence for his convictions and ordering the sentences to be served consecutively. The Appellant does not dispute the application of any of the enhancement factors found by the court or the finding that he was a dangerous offender. Instead, the Appellant contends that the trial court imposed the maximum sentences because it thought that the jury should have found the Appellant guilty of first degree murder, which the Appellant argues violated Blakely v. Washington, 542 U.S. 296 (2004).[6]

The trial court specifically noted that although the State may not have proven first degree murder beyond a reasonable doubt, the offense was proven by a preponderance of the evidence. The court did not, however, impose the maximum sentences and consecutive sentencing solely on this basis. Instead, the court thoroughly reviewed the enhancement and mitigating factors as well as the factors for consecutive sentencing. The Appellant acknowledges that the court sentenced the Appellant within the appropriate range. We conclude that the trial court did not abuse its discretion.

### III.  Conclusion

In sum, we conclude that the trial court's error in instructing the jury entitles the Appellant to a reversal of his convictions and a new trial.

_____
NORMA MCGEE OGLE, JUDGE

---

[6] In Blakely, the Supreme Court explained that the "'statutory maximum' for Apprendi[v. New Jersey, 530 U.S. 466 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Blakely, 542 U.S. at 303.